**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**PETROLEUM TRADERS
CORPORATION,**

    **Plaintiff,**

v.                                                       **Case No. 8:06-cv-2289-T-TBM**

**HILLSBOROUGH COUNTY and
CITY OF TAMPA,**

    **Defendants.**
_____/

**O R D E R**

THIS MATTER is before the court on **Defendant Hillsborough County's Second Motion for Summary Judgment** (Doc. 85), Defendant City of Tampa's Notice of Joining Defendant Hillsborough County's Second Motion for Summary Judgment (Doc. 87), and Plaintiff's response in opposition to Hillsborough County's motion (Doc. 88); and Plaintiff's **Cross-Motion for Summary Judgment Against Hillsborough** (Doc. 97), Plaintiff's **Cross-Motion for Summary Judgment Against City of Tampa** (Doc. 99), Defendant Hillsborough County's response in opposition (Doc. 101), and Defendant City of Tampa's response in opposition (Doc. 104).

I.

In August 2003, Hillsborough County, on behalf of itself, the Sheriff's Office, and the City of Tampa, issued an Invitation for Bid #T-821-03(RB) seeking bids for a cooperative purchase of 87 octane gasoline, low sulfur # 2 diesel fuel ("#2 diesel fuel"), and aviation fuel.

In response to the bid solicitation, Petroleum Traders Corporation ("PTC" or "Plaintiff") submitted quotes at which it was willing to sell fuel to the Defendants.[1] In or about October 2003, the Defendants awarded PTC the gasoline and diesel portion of Bid #T-821-03(RB). Beginning in November 2003, Defendants purchased fuel from PTC by issuance of purchase orders requesting PTC's delivery of specific quantities of fuel at the price dictated by the bid. By PTC's allegations, it has accepted and honored each of the Defendants' purchase orders. In 2006, the distributor from whom PTC purchased its fuel began phasing out the #2 diesel fuel and replacing it with ultra-low sulfur diesel fuel ("ULSD"), which Plaintiff claimed was more expensive. In about July 2006, PTC began providing ULSD to the Defendants in response to purchase orders from Defendants. Defendants were noticed in advance that Plaintiff intended a price change and, beginning in August 2006, PTC began including a $0.05 per gallon markup over the bid price in its invoices to Defendants to reflect the higher costs for the ULSD. The Defendants claim never to have agreed to any price other than the bid price. While they accepted the ULSD, they paid Plaintiff's invoices only to the extent of the bid price. In December 2006, PTC filed the instant action. By Order dated October 14, 2008, the court granted in part Plaintiff's motion for judgment on the pleadings, concluding that the contract allegedly formed from the bid documents was illusory and unenforceable.

---

[1] A copy of the Invitation to Bid is attached as an exhibit to the Amended Complaint. *See* (Doc. 18-2).

The Order left standing Count III of the Amended Complaint.[2] In pertinent part, the court stated:

> On that conclusion, it follows in this case that Plaintiff is also correct that the course of sales and purchases of diesel fuel that followed created a series of individual contracts. The UCC makes abundantly clear that "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Fla. Stat. § 672.204(1). As Defendants note, "[r]eceipt and acceptance of goods . . . constitutes an unambiguous overt admission by both parties that a contract actually exists." Fla. Stat. § 672.201 cmt. 2. Indeed, "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract . . . ." Fla. Stat. § 672.207(3). Further, where, as here, the contract involves repeated occasions of performance, "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." Fla. Stat. § 672.208(1). Here, the undisputed facts reveal that shortly after the acceptance of the Plaintiff's proposal, the Defendants began placing orders and accepting deliveries for gas and diesel and paid in accordance with the prices offered in the bid documents. Despite the lack of an enforceable written contract, the parties clearly evidenced their agreement for the sale and purchase of fuel in each instance. Thus, the agreement of the parties resulting from Bid #T-821-03(RB), PTC's proposal/offer in response and Defendants' acceptance was illusory and did not create an enforceable agreement. However, under the UCC, enforceable contracts were created thereafter on each occasion when Defendants ordered and accepted fuel delivered by PTC.

(Doc. 79 at 11-12). Thereafter, the trial of the matter was continued on Hillsborough County's request that Defendants be permitted to file a second round of dispositive motions.

---

[2]In Count III, PTC alleges that a separate, individual contract was formed each time the Defendants issued a purchase order to PTC and PTC delivered fuel to the Defendants. PTC alleges Defendants materially breached each of these agreements by refusing to pay PTC's invoices [in full] for the fuel they received.

3

As Hillsborough County now frames the dispute, "the essence of the parties' disagreement is whether the **invoices** govern price, or whether **the purchase orders** govern price." (Doc. 85 at 5) (emphasis in original). It proposes alternative resolutions based on different provisions of the Florida Uniform Commercial Code ("UCC"). Citing first to section 672.207 of Florida Statutes, Defendants argue that the price increase reflected for the ULSD was an unexpected material alteration of the agreement to which they did not consent and therefor was ineffectual and unenforceable.[3] Alternatively, Defendants argue that section 672.305 of Florida Statutes calls for the court to determine a "reasonable price" for the ULSD and, under the facts and course of performance in this case, that price is the price originally agreed in the bid documents.

In opposition and by its cross motion, while PTC agrees that the dispute is governed by the UCC, it disagrees with Defendants' application of sections 672.207 and 672.305 of the Florida Statutes to the facts in this case. Under § 672.207, it urges that the Defendants cannot claim surprise as to the price increase such that the additional costs materially altered the contract. It further argues that, in any event, the question of whether the price increase

---

[3]Defendants maintain that they never agreed to pay any price other than that set by the bid documents. An affidavit from Barbara Kicklighter, the County's fuel coordinator, states that before the first delivery of ULSD and immediately upon receiving the request from Plaintiff to increase the fixed price, the County notified PTC that it was unable and unwilling to pay the increased amount. When PTC began invoicing at the higher price, the County again noticed PTC that it was unwilling to pay the higher price and it returned the invoices for rebilling at the purchase order price. In each such case, PTC issued revised invoices reflecting the bid price and indicating that it was "a corrected re-billing of a previous invoice." The affidavit also speaks to the hardship that would befall the County were it required to pay the unexpected and unbudgeted higher price. (Doc. 101). An affidavit from the City of Tampa's procurement analyst indicates that, in response to the PTC deliveries and invoices at issue, the City responded with a notice of remittance shortage indicating that its remittance checks were for less than the amount of the invoice because the price on the invoice did not conform to PTC's quote. *See* (Doc. 105 and exhibits).

4

materially altered the contract is a question of fact for the jury to decide, and that, even if the invoice price did not become a part of the contract, it is still entitled to recover the reasonable price for the fuel.[4] Contrary to the Defendants' contentions, PTC urges that the price in its invoices did not materially alter the agreements and thus is the controlling contract price. It urges further that it is entitled to summary judgment for the aggregate amount of the unpaid portion of the invoices.[5] Alternatively, it argues that if its invoice prices did not become part of the contracts under § 672.207, pursuant to § 672.207(3) and the UCC gap fillers, in particular, § 672.305, the contract price is the "reasonable price" for the fuel at the time of each sale. Again, it cites cases suggesting that the reasonable price issue is a question of fact for the jury.[6] However, it urges that since it has proffered evidence on the matter of reasonableness from Mr. Himes and Defendants have not proffered evidence on such, the court can determine its invoice price to be the "reasonable price" under § 672.305 and award it a judgment in the amount of $104, 605.00.[7]

---

[4]PTC cites *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F.2d 758, 765 (10th Cir. 1983); *Luedtke Eng'g Co. v. Ind. Limestone Co.,* 740 F.2d 598, 600 (7th Cir. 1984); *N & D Fashions, Inc. v. DHJ Indus., Inc.,* 548 F.2d 722, 726 (8th Cir. 1976); *Dorton v. Collins & Aikman Corp.,* 453 F.2d 1161, 1169 n. 8 (6th Cir. 1972).

[5]PTC cites the comments to § 672.207, which indicate that a clause materially alters the contract where it would "result in surprise or hardship if incorporated without express awareness by the other party." *Id.* at cmt 4. It urges that there can be no such surprise in the given circumstances where prior notice was given, and, significantly, where Defendants offer no evidence that they ever expressly objected to the invoices. *See also Schulze & Burch Biscuit Co. v. Tree Top, Inc.,* 831 F.2d 709 (7th Cir. 1987)*; Barliant v. Follett Corp.,* 483 N.E.2d 1312 (Ill. App. Ct. 1985).

[6]*See Fischer Imaging Corp. v. Gen. Elec. Co.*, 187 F.3d 1165 (10th Cir. 1999); *Allapattah Servs. v. Exxon Corp.*, 61 F. Supp. 2d 1308 (S.D. Fla. 1999); *Great W. Distillery Prods., Inc. v. John A. Wathen Distillery Co.*, 74 P.2d 745 (Cal. 1937).

[7]Mr. Himes testified that, as early as July 26, 2006, PTC told the County on behalf of the Defendants that PTC would begin charging an additional $.05 per gallon for the ULSD

II.

In the prior Order, the court concluded that, despite the lack of an enforceable written contract, the parties clearly evidenced their agreement for the sale and purchase of fuel in each instance where such was ordered and delivered. Under the UCC, enforceable contracts were created on each such occasion. As the UCC makes clear, "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Fla. Stat. § 672.204(1). "Receipt and acceptance of goods . . . constitutes an unambiguous overt admission by both parties that a contract actually exists." Fla. Stat. § 672.201 cmt. 2. The undisputed facts suggest that the parties operated without disagreement with PTC delivering # 2 diesel fuel until in or about June 2006, when government regulations dictated that refiners lower the sulfur content in diesel fuel. Plaintiff then notified Defendants of the change and of the fact that PTC intended to charge an additional $.05 per gallon for the ULSD it soon would be shipping. While disputed by PTC, Defendants proffer that they immediately notified PTC that they were unwilling to pay the additional amount and the exhibits reveal that the Defendants did object to the higher prices reflected in the invoices as they came in. It appears that the parties continued to employ the same practice in ordering and delivering the fuel even after PTC

---

and that it soon would begin shipping to conform to new government regulations. On August 9, 2006, PTC sent a letter to all customers informing them that the ULSD it was shipping was a new and different product and alerted them to the nickel per gallon price increase. *See* (Docs 89, 100 and exhibits). Copies of PTC's invoices and revised "partially paid" invoices are attached to this affidavit and Mr. Himes' earlier affidavit. *See* (Docs. 68 and 89, 100-4).

The affidavits outline the general protocol used by the Defendants in ordering fuel, either by telephone or through purchase order, and the manner in which such was invoiced. Sometime prior to July 2006, the Defendants began ordering the ULSD. This product was shipped and invoiced at the higher rate. Defendants paid the invoices less $.05 per gallon. (Doc. 68-2).

began delivering ULSD. Thus, the Defendants would issue written purchase orders (or place their orders by telephone) requesting the delivery of ULSD at the price dictated by the bid documents.[8] Each shipment was thereafter delivered and invoiced at the higher price at which PTC had advised it would bill for the product. Defendants paid the invoices to the extent of the price per gallon under their purchase orders, thus deducting the $.05 per gallon additional charge in the invoice. As Defendants suggest, PTC did thereafter issue revised partial invoices but these invoices cannot be read to indicate that the unpaid sums under the original invoices were forgiven. Indeed, they indicate the contrary.

The undisputed facts and circumstances reveal that after June 2006, the parties agreed to carry on their commercial relationship (for a time) despite a disagreement on the price to be paid for the ULSD. The Defendants, believing that they had a valid contract, sought to hold PTC to the bargained for price under the bid documents even though they knew PTC intended to charge them a higher price for the new product. PTC, while not disputing the validity of the contract at that time, delivered up the ULSD under invoices seeking a higher price it knew Defendants did not intend to pay. Unable to resolve the dispute, PTC turned to the court.

Initially, it seems clear that had the court not determined that the contract resulting from the bid process was illusory, PTC would have no legitimate basis to argue that it was entitled to the higher price. As Defendants urge, the very purpose for their entering into the agreement was to assure a stable price for their fuel needs, and the change in the market that occurred here appears the precise type of risk that they sought to assure against and which

---

[8]The County suggests that this ULSD product is the product they should have been receiving all along. However, this contention is, at a minimum, in dispute as it appears that PTC's bid, as accepted, offered the #2 diesel fuel which it delivered without objection for many months.

7

PTC assumed. Had there been a valid contract, it is unlikely that this change in the market would have relieved PTC of the bargained for price. Such was the risk it assumed. But the contract under the bid documents was entirely illusory. As a result of this fortuitous circumstance in favor of PTC, it seeks to shift the risk to the Defendants. And, as presented by the parties, a different set of rules now apply.

After considering the respective arguments, I find that § 672.207 is applicable to the circumstances of this case, if at all, only at subsection (3). This case does not present the type "battle of the forms" which subsection (2) is intended to address. Here, even before the forms were exchanged, indeed, even before the first delivery of ULSD was made, the parties knew that they were not in agreement about the price of this product. Defendants were on notice that PTC intended to charge the higher price for the ULSD and PTC was on notice that Defendants were unwilling to pay any price other than that called for under the bid documents. Nonetheless, the Defendants determined to continue to order fuel from PTC and PTC determined to continue to deliver it. In effect, their conduct indicates that they agreed to continue their business dealings and to disagree over price. The court cannot agree that the provisions of § 672.207(2) are applicable to supply the disputed price term. Under subsection (3), the court may look to gap filler provisions in the code. Fla. Stat. § 672.207(3). Here, § 672.305 appears to be the closet fitting gap filler.

Under § 672.305, parties intending a contract for sale may conclude the contract even though the price is not settled. In such circumstances, if the price was left to be fixed by the parties and they failed to do so, then the price is the "reasonable price at the time of delivery." Fla. Stat. § 672.305. That is the result the court concludes is applicable here. While such a result may present PTC with something of a windfall, depending on what the reasonable price

8

is determined to be, in the peculiar circumstances of this case it appears the appropriate way to resolve this dispute.

While PTC urges that it has presented undisputed evidence that its $.05 per gallon surcharge was the reasonable price, the court finds the matter a question of fact.

III.

Accordingly, for the reasons set forth above, **Defendant Hillsborough County's Second Motion for Summary Judgment** (Doc. 85), PTC's **Cross-Motion for Summary Judgment Against Hillsborough** (Doc. 97), and PTC's **Cross-Motion for Summary Judgment Against City of Tampa** (Doc. 99) are **DENIED**. The matter will be calendared for trial on the issue of the reasonable price of the ULSD at the time of delivery by separate order.

**Done and Ordered** at Tampa, Florida, this 22nd day of May 2009.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record